UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                  :

STEPHEN FOX,               :
                  :
          *Petitioner,*    :
                  :    MEMORANDUM AND ORDER
     - against -        :
                  :    10-CV-2986 (JG)
NORMAN R. BEZIO,       :
                  :
                  :
         *Respondent.*  :
-------------------------------------------------------------- X

A P P E A R A N C E S :

       STEPHEN FOX
           # 06-A-0135
           Great Meadow Correctional Facility
           P.O. Box 51
           Comstock, New York 12821-0051
           *Petitioner, pro se*

       DANIEL M. DONOVAN, JR.
           Richmond County District Attorney
           130 Stuyvesant Place
           Staten Island, New York 10301
       By:   Anne E. Grady
           *Attorney for Respondent*

JOHN GLEESON, United States District Judge:

       Stephen Fox petitions for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Fox challenges his December 2005 convictions in New York State Supreme Court, Richmond

County, of two counts of murder in the second degree (intentional and felony murder), two

counts of robbery in the first degree, arson in the third degree, grand larceny in the third degree,

criminal possession of a weapon in the third degree, and criminal possession of stolen property.

Appearing *pro se*, Fox seeks habeas relief on the grounds that he was denied a fair trial and

received ineffective assistance of counsel.  Oral argument was heard on January 28, 2011, at

which Fox appeared via videoconference from his place of incarceration. For the reasons stated below, Fox's petition is denied.

BACKGROUND

A.     *The Offense Conduct*

The evidence at trial established that Fox bludgeoned William Reich to death as he slept on his couch on the night of September 25, 2004. Fox worked for Reich installing carpets. The night of the murder, Fox had gone to visit Reich at his house in Staten Island, and the two men got into an altercation when Fox asked Reich for money and Reich declined. Reich had lent money to Fox in the past and had even purchased marijuana from him, but their relationship had soured in the months preceding Reich's murder, especially after Fox ripped off Reich in a drug transaction. When the disagreement escalated on the night of September 25, Reich told Fox he wanted him out of his house and that he was going to call the police. Fox then began beating Reich with a pipe, striking him on the head and neck approximately four times, which resulted in fractures to Reich's jaw, skull and spine, among other injuries. Blood spattered onto Fox's clothes. Fox then ransacked Reich's house, took the keys to Reich's cherished GMC Envoy truck and fled the scene in the truck. While Reich's death was not immediate, he died soon after the beating, still lying on the couch. His employee and friend, Eric Carew, discovered him dead in his house the next day after Reich had failed to show up for a carpeting job that morning.

The police were able to track Reich's vehicle via its OnStar tracking device, and upon getting a call from OnStar reporting the location of the vehicle, they intercepted it at approximately 3:15 AM on September 27, 2004 at the Berry Houses on Staten Island. After watching the vehicle for a few minutes, Detective Frank Viani, Detective Michael Kenny and

2

Officer Michael Palm observed Fox approach the vehicle, unlock it, open the rear passenger door, wait for approximately 20 seconds, close the door and begin to walk away from the vehicle. Approximately ten seconds later, smoke started to emanate from the vehicle, revealing that it had caught fire. The detectives then exited their car, called out Fox's name and chased him as he ran away from them. They ultimately apprehended Fox at gunpoint in a neighborhood baseball park, and as they handcuffed him, he blurted out, "the niggers did it." The detectives then drove Fox to their stationhouse.

B.    *Procedural History*

    1.    *The Suppression Hearing*

        Fox was charged with one count of intentional second-degree murder, N.Y. Penal Law § 125.25(1), one count of felony murder, *id.* § 125.25(3), two counts of robbery in the first degree, *id.* § 160.15(1) & (3), grand larceny in the third and fourth degrees, *id.* §§ 155.35(1) & 155.30(8), criminal possession of a weapon in the third degree, *id.* § 265.02(1), criminal possession of stolen property in the third, fourth and fifth degrees, *id.* §§ 165.50, 165.45(5) & 165.40, and arson in the third degree, *id.* § 150.10(1). On June 2, 2005, Justice Stephen Rooney of the New York State Supreme Court, Richmond County held a *Wade/Huntley*[1] hearing upon Fox's omnibus motion to suppress his statements to the police and Carew's identification of him by photo array.

        At the hearing, Detectives Viani and Kenny testified that they arrived at the Berry Houses at approximately 3:15 AM on September 27, 2004 after receiving a call from OnStar placing Reich's vehicle at that location. They found the vehicle there, and within moments saw Fox approach it and set fire to it. Fox then ran from the detectives, but they chased him and

---

[1]    A *Wade* hearing is held to assess whether the state used unduly suggestive identification procedures to obtain evidence against a defendant. *See United States v. Wade*, 388 U.S. 218 (1967). A *Huntley* hearing tests the voluntariness of a defendant's post-arrest statements. *See People v. Huntley*, 15 N.Y.2d 72 (1965).

eventually stopped him at gunpoint.  Viani approached Fox, placed him in handcuffs without asking him any questions, and Fox blurted out, "I didn't do anything, the niggers did it."  Viani searched Fox and recovered some change, candy and a book of matches.  Tr. at 6-11, 18-19, 22, 25-26, 37.[2]

Kenny further testified that he drove Fox to the 122nd Precinct stationhouse at approximately 3:30 AM, placed Fox into an interview room there and handcuffed one of his wrists to a bar affixed to the wall.  At 5:45 AM, Kenny read Fox his *Miranda* warnings.  Kenny read them from the inside cover of a blank police memo book on which they were printed, since he could not at that time locate the more commonly used *Miranda* police form.  Fox stated that he understood and waived each right, although he interrupted Kenny at one point to tell him he did not have to continue because Fox had been through all of this before.  Kenny told Fox the warnings were required and continued reading them and eliciting a response from Fox after each right.  Fox also stated that he had not done anything and had nothing to hide, and therefore had "no problem" with speaking to Kenny.  Kenny did not require Fox to sign any forms acknowledging he understood and had waived his rights.  *Id.* at 56-57, 80.

Beginning at approximately 6:00 AM, Fox gave Kenny an account of his whereabouts over the preceding few days, stating that he was at Reich's house the night of the murder but denying that he knew about the murder or had set fire to Reich's car.  From 7:00 AM until 1:45 PM, Kenny came in and out of the interview room, attempting to verify parts of Fox's story and checking to see if he was all right.  At approximately 1:45 PM, Kenny entered the room with Polaroid photographs taken of Reich's body and Kenny placed them in front of Fox, asking him how he could do that to a friend.  Fox reacted violently by standing up abruptly, throwing a chair, flipping over the table and heatedly asking Kenny, "how could you show [those

---

[2] Citations to the transcript of the state court proceedings are preceded by "Tr."

pictures] to me?"  After leaving the room and giving Fox time to cool off, Kenny and a

lieutenant returned at 2:00 PM, and Kenny recommenced formal questioning of Fox without re-

reading him his *Miranda* rights.  There were some inconsistencies[3] between Fox's statement at

this time and his earlier statement, but he reaffirmed that he had nothing to do with either Reich's

murder or the arson.  *Id.* at 62-65, 95-97.

On September 6, 2005, Justice Rooney issued a written decision denying Fox's

motion to suppress.  With respect to the voluntariness of Fox's post-arrest statements, Justice

Rooney found as follows: (1) Fox's statement to Detective Viani at the baseball field was

spontaneous and not the product of police interrogation; and (2) Fox's statements to Detective

Kenny at the police precinct, although "clearly the product of custodial interrogation," were

voluntary because "*Miranda* warnings were administered prior to any interrogation, and the

defendant knowingly, intelligently and voluntarily waived his rights before making statements."

Justice Rooney further noted that Kenny's display of photographs of Reich to Fox was not a

coercive tactic, and he found no evidence of improper police conduct or anything to "suggest that

the statements were evoked by threats, coercion or any severe deprivation of the necessities of

life."[4]

---

[3]     Kenny elaborated on these inconsistencies when he testified at trial.  One inconsistency that the prosecutor highlighted in his summation was Fox's additional statement during the afternoon interrogation that when he returned to Reich's house the morning of September 26 and saw a crime scene sticker on the front door, he tore off the sticker and threw it to the ground, believing the police had raided the house for drugs.  Tr. at 408.  Fox's afternoon account also differed from his earlier account in that it included additional statements that: Reich had loaned Fox his truck the night of September 25 because Fox had to return to Reich's house the next morning for a carpet job with Reich; Fox slept at his girlfriend's house in Brooklyn the night of September 25; Fox woke up the following afternoon, drove to his grandmother's house, went to another location to buy drugs, went to his aunt's house, and then, at approximately 2:00 AM the next morning, returned to Staten Island in Reich's truck.  *Id.*

[4]     The court also denied Fox's *Wade* motion upon finding that Carew's identification of Fox was "merely confirmatory."

2.      *The Trial and* Massiah-Cardona *Hearing*

Fox proceeded to a jury trial before Justice Rooney.  Among the People's witnesses were Katherine Sadecki and Christopher Franklin, both of whom met Fox in the state penal system after having been arrested in their own cases.  They both testified at trial to admissions Fox made to them regarding his involvement in Reich's murder and the burning of Reich's car.  Before Franklin testified, the court held a *Massiah-Cardona* hearing[5] to determine whether he had acted as an agent of the state when he spoke to Fox in the holding pens of the state courthouse.  *See* Tr. at 869-906.  At the conclusion of the hearing, the court found that the Richmond Country District Attorney was nothing more than a passive recipient of the information about Fox that Franklin provided to him in a letter, and that there was no indication that the District Attorney had promised Franklin any benefit in his pending assault case for having come forward with the information about Fox.  *Id.* at 906.  The court therefore found that Franklin had not acted as an agent of the state and permitted him to testify at trial.  *Id.* at 906-07.

Franklin testified at trial that while he and Fox were waiting in the holding pens of the state courthouse on December 9, 2004 to appear for their respective plea proceedings, Fox "said that he was charged for murder, and then he basically broke down and . . . [said] how he accidentally basically killed the guy," a former employer.  *Id.* at 922.  Franklin testified that Fox's explanation for the murder was that he "was forced into a situation where . . . he was trying to get money from the man . . . , the guy wanted him out of the house and things got out of hand," and Fox "accidentally killed him," using a "pipe."  *Id.* at 922-23.  Franklin also testified

    [5]      A *Massiah* hearing tests the admissibility of statements given by an indicted defendant to the government or its agents.  *Massiah v. United States*, 377 U.S. 201 (1964).  Under *Massiah*, the Sixth Amendment right to counsel is violated when a private individual acting as a government agent deliberately elicits incriminating statements from an accused in the absence of his counsel.  *United States v. Miller*, 116 F.3d 641, 665 (2d Cir. 1997).  A *Cardona* hearing, functionally equivalent to a *Massiah* hearing, is held in New York State court proceedings and tests whether a prosecution witness was acting as an agent of the District Attorney when he or she spoke to the defendant in jail.  *See People v. Cardona*, 41 N.Y.2d 333 (1977).  In New York State prosecutions, this type of hearing is commonly referred to as a *Massiah-Cardona* hearing.

that Fox said witnesses saw him "trying to burn the vehicle," and that Fox's reason for burning the truck was that he wanted "to stage a scene, to make it seem like something happened to the guy, trying to stage a murder." *Id.* at 926.

The court did not hold a *Massiah-Cardona* hearing with respect to Katherine Sadecki because defense counsel waived such a hearing after reviewing Sadecki's arrest record, rap sheet and other documents. Tr. at 540. Sadecki testified at trial that she met Fox on September 28, 2004 on a bus to Rikers Island, and that he tried to convince her to show him her breasts by saying: "I'm going – I'm up in here for a murder charge doing 25 to life. I'm never going to see a woman again. You really need to help me out." *Id.* at 727. Sadecki testified that she then told Fox she didn't believe him, to which he responded by pulling out a newspaper article about him with the headline "Hi-Tech Trackdown," showing it to Sadecki and saying, "[l]ook, look, this is me," and then telling her that he made a bomb, put it under his boss's car and "blew him up." *Id.* at 728-29, 785; *see also id.* at 780 ("He said that he murdered his boss.").

On October 31, 2005, the jury found Fox guilty of two counts of second-degree murder, two counts of robbery in the first degree, grand larceny in the third degree, criminal possession of a weapon in the third degree, criminal possession of stolen property in the third degree, and arson in the third degree.

3.      *The Sentencing*

On December 21, 2005 Justice Rooney sentenced Fox as a second violent felony offender to concurrent terms of incarceration of 25 years to life on each murder count, 25 years of incarceration plus five years of post-release supervision on the robbery counts, and three and one-half to seven years of incarceration on each of the weapons possession, possession of stolen

property and grand larceny counts.  In addition, Justice Rooney imposed a consecutive term of seven and one-half to fifteen years of incarceration on the arson count.

4.     *The Direct Appeal*

Fox appealed from the judgment of the Supreme Court on the grounds that: (1) his post-arrest statements to the police should have been suppressed in light of the lack of credible evidence that he was administered *Miranda* warnings; (2) the cumulative effect of the prosecutor's invocation of Fox's pre-trial silence and the admission into evidence of Sadecki's and Franklin's prejudicial testimony deprived Fox of his rights to due process and a fair trial; (3) he was denied the effective assistance of counsel as a result of his attorney's failure to object to the foregoing trial errors; and (4) his sentence was excessively harsh.

In a decision issued on March 24, 2009, the Appellate Division, Second Department, affirmed the Supreme Court's judgment of conviction and sentence.  *People v. Fox,* 876 N.Y.S.2d 98 (2d Dep't 2009).  The Appellate Division held that the hearing court properly denied Fox's motion to suppress his statements to the police because "the statements were made after the knowing, voluntary, and intelligent waiver of his *Miranda* rights, and were not the product of coercion."  *Id.* at 98 (citations omitted).  As for Fox's claim that he was denied a fair trial because the prosecutor questioned him regarding his omission of certain exculpatory information from his post-arrest statements to law enforcement, the court held that the claim was unpreserved but also denied it on the merits.  The court explained that although a defendant's post-arrest silence generally cannot be used for impeachment purposes, where, as here, "a defendant speaks to the police and omits exculpatory information which he presents for the first time at trial, the defendant's credibility may be impeached with the omission."  *Id.* at 99 (citations omitted).  The court also held that Fox "was not denied the effective assistance of

counsel," his sentence "was not excessive," and his remaining contention – *i.e.*, that the admission of Sadecki's and Franklin's testimony deprived him of a fair trial – was unpreserved and without merit. *Id.*

Fox applied for leave to appeal from this decision but a judge of the Court of Appeals denied his application on June 30, 2009. *People v. Fox*, 12 N.Y.3d 915 (2009) (Lippman, C.J.).

5. *The Instant Petition*

Fox filed this petition on June 28, 2010, claiming that he is entitled to a writ of habeas corpus under 28 U.S.C. § 2254 because: (1) his right to a fair trial was violated by the admission into evidence of his post-arrest statements made without the prior administration of *Miranda* warnings; (2) his right to a fair trial was violated by the admission into evidence of Sadecki's and Franklin's testimony; (3) his rights to a fair trial and against self-incrimination were violated when the prosecutor adverted to Fox's pre-trial silence as indicative of his guilt; (4) Fox's trial counsel's failure to object to the prosecutor's references to Fox's pre-trial silence constituted ineffective assistance of counsel; and (5) counsel's failure to object to the admission of Sadecki's and Franklin's testimony also amounted to ineffective assistance of counsel.

DISCUSSION

A. *Standard of Review*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") narrowed the scope of federal habeas review of state convictions where the state court has adjudicated a petitioner's federal claim on the merits. 28 U.S.C. § 2254(d). Under the AEDPA standard, the reviewing court may grant habeas relief only if the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," *id.* § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding," *id.* §

2254(d)(2).[6]

The Supreme Court has interpreted the phrase "clearly established Federal law" to

mean "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of

the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *see also*

*Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001). A decision is "contrary to" clearly

established federal law if "the state court arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law or if the state court decides a case differently than [the

Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A

decision is an "unreasonable application" of clearly established federal law if a state court

"identifies the correct governing legal principle from [the Supreme Court's] decisions but

unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* "In other words, a

federal court may grant relief when a state court has misapplied a 'governing legal principle' to

'a set of facts different from those of the case in which the principle was announced.'" *Wiggins*

*v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Lockyer v. Andrade*, 538 U.S. 63, 76 (2003)).

Under the "unreasonable application" standard set forth in *Williams*, "'a federal

habeas court may not issue the writ simply because that court concludes in its independent

judgment that the relevant state-court decision applied clearly established federal law

erroneously or incorrectly. Rather, that application must also be unreasonable.'" *Gilchrist*, 260

F.3d at 93 (quoting *Williams*, 529 U.S. at 411). Elaborating on this standard, the Supreme Court

has held that a habeas court may only "issue the writ in cases where there is no possibility

---

[6]       This limitation on relief is referred to as "AEDPA deference." *E.g.*, *Jimenez v. Walker*, 458 F.3d
130, 135 & n.2 (2d Cir. 2006).

fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011); *see also id.* at 786-87 (a state prisoner seeking federal habeas relief "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement"). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 786.

AEDPA's limited scope of review applies whenever a state court disposes of a state prisoner's federal claim on the merits and reduces its disposition to judgment, regardless of whether it gives reasons for its determination or refers to federal law in its decision. *See Richter*, 131 S. Ct. at 785; *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001).

In addition to the deference owed to state court determinations of fact under § 2254(d), subsection (e) requires that a federal habeas court presume all state court factual determinations to be correct. The petitioner has the burden of rebutting this presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

B.      *Fox's Claims*

1.      *Admission of Post-Arrest Statements*

Fox's first contention is that the court's denial of his pre-trial motion to suppress his post-arrest statements to law enforcement deprived him of a fair trial. In those statements, Fox told Detective Kenny that he was not present at Reich's house when Reich was murdered, and that unidentified African-American men set fire to Reich's truck.[7] Fox claims that he was

---

[7]      In his pre-trial omnibus motion, Fox also sought to suppress his statements to law enforcement upon his arrest that he "didn't do it" and that unidentified African-American men had set fire to Reich's truck. While Fox's petition does not refer to these statements specifically, in the event that he seeks to challenge their

never given *Miranda* warnings and that his statements therefore were elicited involuntarily. As the Supreme Court held in *Miranda v. Arizona*, 384 U.S. 436, 467 (1966), in order "to permit a full opportunity to exercise the [Fifth Amendment] privilege against self-incrimination," an "accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored."

To prove that a defendant validly waived his *Miranda* rights, the government must establish: (1) that the relinquishment of the defendant's rights was voluntary, "in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception"; and (2) that at the time of the waiver, the defendant had a "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). The determination of whether the defendant knowingly and voluntarily waived his *Miranda* rights is made upon an inquiry into the totality of the circumstances. *See Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979).

The hearing court found that Detectives Viani and Kenny testified credibly at the hearing, and specifically found that Kenny administered *Miranda* warnings to Fox before Fox made the statements at issue. On these findings, the court denied Fox's motion to suppress his post-arrest statements, and the Appellate Division upheld the court's denial of Fox's motion, finding that the statements "were made after the knowing, voluntary, and intelligent waiver of [Fox's] *Miranda* rights, and were not the product of coercion." *People v. Fox,* 876 N.Y.S.2d at 98 (citations omitted). I accord these findings a presumption of correctness, 28 U.S.C. § 2254(e)(1), which Fox may rebut only with clear and convincing evidence to the contrary.[8] *See*

admission as well, I conclude that the state courts' determination that those statements were made voluntarily was not unreasonable in light of the evidence presented at the suppression hearing.
        [8]      The Supreme Court has not yet spoken on the precise relationship between AEDPA's two provisions requiring deference to state courts' findings of fact, *i.e.*, 28 U.S.C. § 2254(d)(2) and (e)(1). *See Wood v.*

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." (citations omitted)).

Fox now challenges the credibility of Detective Kenny at the suppression hearing and contends that the record contains "no credible evidence that *Miranda* warnings were ever administered." Pet. at 15. He further argues that Kenny did not believe that *Miranda* warnings were necessary at the time of his interrogation of Fox, later learned that they were, and subsequently "attempted to mislead the [hearing] court by proffering a copy of the warnings while suggesting that it was the same document used during the interrogation." *Id.* at 16. Fox therefore submits no new evidence on the issue of whether his post-arrest statements were lawfully elicited, relying only on his own account of the interrogation and his contention that Kenny's testimony was incredible.

Kenny testified at the suppression hearing that he read Fox his *Miranda* warnings shortly after bringing him back to the precinct, at approximately 5:45 AM on September 27, 2004. Tr. at 46-47. He further testified that the *Miranda* warnings he read were "the standard warnings" and that he read them from the inside cover of a blank, unassigned police memo book, on which they were printed. *Id.* at 48; *see also id.* at 51, 53-54. Kenny then testified that he advised Fox of each of his *Miranda* rights and that Fox replied that he understood those rights and waived them, while also noting at one point that he had "been through this before" and that

---

*Allen*, 130 S. Ct. 841, 848-49 (2010). Specifically, the Court has not determined "whether the arguably more deferential standard set out in § 2254(e)(1) applies in every case presenting a challenge under § 2254(d)(2)." *Id.* at 849. In my view, § 2254(e)(1) applies where, as here, the state court conducts an evidentiary hearing and makes findings of fact on the disputed issues of fact. However, because I also conclude that the state court's findings about the voluntariness of Fox's statements were not unreasonable, I would reject Fox's argument under either standard of review.

Kenny "didn't have to go on." *Id.* at 56. Kenny testified that he nevertheless continued with the warnings, and that Fox stated that he understood and waived the remainder of the rights read to him, telling Kenny at the conclusion of the reading that "he didn't do anything, he had nothing to hide, and he had no problems with speaking to [Kenny]." *Id.* at 57. When asked whether he re-Mirandized Fox before formally questioning him again at 2:00 PM, Kenny said "[n]o." *Id.* at 62. Kenny testified, however, that Fox remained in the same interview room throughout the hours he spent in custody at the precinct, and that Kenny frequently returned to that room to ask Fox questions to clarify his original statements and to check on him throughout the hours between Fox's early morning statements and the 2:00 PM interrogation. *Id.* at 62. Kenny further testified that he and the other police officers did not make any threats or promises to Fox or draw their weapons on him throughout the periods of interrogation, and that they allowed him to drink and use the bathroom upon his request. *Id.* at 64-65. Kenny testified that he showed Fox pictures of Reich's body before questioning him again at 2:00 PM, but gave him time to cool off before beginning the questioning. *Id.* at 92-95. Finally, Kenny testified that he did not ask Fox to sign a document reflecting that he had been read his *Miranda* warnings while he was in custody. *Id.* at 65, 80-82.

I conclude that Fox has failed to rebut the presumption of correctness that attaches to the state courts' findings that Fox was read his *Miranda* rights, and that he knowingly and voluntarily waived those rights before making the statements to law enforcement that were admitted at trial. Because the state courts' factual determinations on this issue were not objectively unreasonable in light of the evidence presented at the suppression hearing, *Miller-El*, 537 U.S. at 340, I defer to those determinations and reject Fox's claim that the state courts erroneously denied his motion to suppress the statements.

2.      *Admission of Other Inmates' Testimony*

Fox contends that the introduction of Katherine Sadecki's and Christopher Franklin's testimony, which included Fox's admissions of his guilt, violated his right to due process of law under the Fourteenth Amendment. A defendant is denied due process when the introduction of prejudicial evidence into his trial "is so extremely unfair that its admission violates fundamental conceptions of justice." *Dowling v. United States*, 493 U.S. 342, 352 (1990) (quotation marks omitted); *see also Dunnigan v. Keane*, 137 F.3d 117, 125 (2d Cir. 1998) (erroneous admissions of evidence not rising to the level of unfairness specified in *Dowling* do not violate the defendant's right to due process).

Fox's contention is essentially that both Sadecki and Franklin, whom he labels "jailhouse snitches," were incredible as a matter of law, and that the court's admission of their testimony was therefore erroneous. This argument is meritless, and I readily conclude that the court's admission of Sadecki's and Franklin's relevant testimony was proper.

Even assuming *arguendo* that the court's admission of the testimony was in some respect erroneous, it did not rise to the level of a due process violation.[9] Sadecki's testimony was probative of Fox's involvement in Reich's murder and his intent to kill Reich. It may have been prejudicial to Fox in the sense that it suggested his culpability of the murder and arson counts, but such prejudice was not fundamentally unfair. In addition, the jury was presented with ample evidence undercutting Sadecki's credibility. As Fox concedes in his petition, Sadecki was impeached on cross-examination by her prior inconsistent statements before the grand jury; in those proceedings, Sadecki testified that Fox told her on the bus to Rikers that he

---

[9]      The Supreme Court has held that the admission of prejudicial evidence that is relevant and probative of an essential element in the case does not violate the Due Process Clause. *See Estelle v. McGuire*, 502 U.S. 62, 69-70 (1991); *see also Dunnigan*, 137 F.3d at 125. Sadecki's and Franklin's testimony was probative of Fox's intent to kill Reich and burn his car. This fact provides an additional ground for concluding that the court's admission of Sadecki's and Franklin's testimony, whether or not erroneous, did not deny Fox due process.

had placed a bomb "underneath his boss' car in order to break into the car. He wasn't trying to kill his boss, but his boss went into the car, and while he was trying to break in, as he went in, the car exploded and blew up." *Id.* at 765. Sadecki admitted to giving that testimony before the grand jury, and it was evident that her trial testimony differed in material respects from her earlier account of her conversation with Fox. Moreover, defense counsel painstakingly drew attention on cross-examination to Sadecki's substantial criminal history and the prospect that she had received some benefit from the District Attorney for testifying in Fox's trial, along with her prior narcotics addiction and psychological disorder. The jury therefore was well equipped to determine Sadecki's credibility and weigh her testimony against the other evidence introduced in the case. Thus, even if Sadecki's testimony was not properly admitted, any unfairness that attended its admission did not approach the level required to establish a due process violation.

Nor is Fox entitled to habeas relief because of the testimony of Christopher Franklin. As noted above, the court conducted a thorough *Massiah-Cardona* hearing as to Franklin and found at its conclusion that Franklin had not been acting as an agent of the state or the District Attorney when he spoke to Fox, and that Franklin's testimony was admissible. Tr. at 906-07. I see no error in these findings. Moreover, Franklin's testimony was relevant and highly probative of Fox's culpability, and to the extent Franklin was not fully credible, the jury was sufficiently alerted to that possibility. Franklin's criminal history and his motive for speaking to the government about his conversations with Fox – namely, to obtain a lower sentence in his assault case (which he ultimately failed to get) – were revealed to the jury on direct examination. *Id.* at 920-21. On cross-examination, defense counsel drew additional attention to Franklin's criminal history and his selfish motives for writing the letter and testifying in Fox's trial. *Id.* at 945. Armed with such information, the jury was capable of deciding

whether to credit Franklin's testimony.  As a result, although Franklin's testimony was damaging to Fox, its admission at trial did not deny Fox due process.

I therefore conclude that the Appellate Decision's determination that Fox's due process claim lacked merit was not an unreasonable application of apposite Supreme Court precedent.[10]

2. *The Prosecutor's Allusion to Fox's Pre-Trial Omission of Certain Exculpatory Details That Came Out in Fox's Testimony at Trial*

Fox also claims that the prosecutor improperly drew attention to Fox's pre-trial "silence" as to certain exculpatory facts to which he testified at trial.  Fox testified at trial that he went to Reich's house the night of September 25, 2004 to return a plumber snake, and that he and Reich "hung out," "smoked a joint" and watched television.  Because they had a job together the next morning, Fox intended to spend the night at Reich's house.  At approximately 10:30 PM, both Fox and Reich began to fall asleep, Reich on the couch and Fox on the carpet next to the couch.  Fox testified that, moments later, he heard two people run into the house through the back door, and "the next thing I know, I had a gun put to my temple," and one man was "poking me with the gun, and they were saying, [w]here is it, where is it," while the other man "went like towards Bill's area."  Fox described the man who put the gun to his head as "black" and "wearing a hat," and further testified that the man asked him, "[w]here's the drugs, where's the money."  Fox responded, "[u]pstairs," and the man told him that if he moved, "he's gonna kill me."  While Fox lay face-down on the carpet, the men "ran upstairs," and Fox testified that he then got up, grabbed Reich's car keys off the table and his own sneakers off the

_____

[10]  Again, despite the fact that the Appellate Division rejected this claim on procedural grounds as well as on the merits, I decline to address Respondent's persuasive argument that the claim was procedurally defaulted because I find that that the claim is meritless.

floor, and ran out the back door. He also testified that he did not see Reich get hit with anything "because it was dark and I didn't look in that direction." Tr. at 1114-22.

On cross-examination, the prosecutor asked Fox whether he recalled having made certain statements to Detective Kenny at the station house regarding the circumstances of his visit to Reich's house and what happened that night. The prosecutor specifically recounted Fox's statements to Kenny that: Fox stayed at Reich's house for approximately 30 minutes, in which time he returned Reich's plumber snake and they smoked a marijuana joint; Fox then asked for and received Reich's permission to borrow his vehicle, and left the house in the vehicle; Fox drove to his girlfriend's house in Brooklyn, then left her house and went to a friend's house where he got high and slept for a while; and the next morning, Fox drove back to Staten Island to return Reich's truck, but upon seeing that no one was at Reich's house, returned to Brooklyn in the vehicle. The prosecutor also reminded Fox of his statements to Detectives Kenny and Viani denying responsibility for the burning of Reich's car. Tr. at 1181-86. Fox alternately accused the detectives of lying about these statements and admitted to making some of them, and further testified that the detectives beat him to elicit a response. *Id.* at 1182-83. After this line of questioning, the prosecutor asked Fox, "[w]hen you spoke to Detective Kenny, during that long 12 hours you were with him, you never told him about the two guys that put a gun to your head, did you?", to which Fox responded, "[n]o, I did not." *Id.* at 1187. In addition, the prosecutor stated in his summation:

> Now, he tells you today . . . about these black guys that came in with guns.
> Well, he didn't tell Christopher Franklin about these black guys with guns.
> He didn't tell Detective Kenny, who was with him for 15 hours that next
> day, about black guys with guns. He didn't tell his girlfriend about the
> black guys with guns; did he not trust her, as well? No, we submit he
> didn't tell any of these people about the black guys because that is a
> figment of the defendant's imagination.

Tr. at 1326.

"[T]he use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving Miranda warnings, violate[s] the Due Process Clause of the Fourteenth Amendment." *Doyle v. Ohio*, 426 U.S. 610, 619 (1976); *cf. Greer v. Miller*, 483 U.S. 756, 764-65 (1987) (no due process violation where the fact of defendant's "postarrest silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference"). *Doyle*'s prohibition against such conduct "rests on the fundamental unfairness of implicitly assuring a suspect that his silence will not be used against him and then using his silence to impeach an explanation subsequently offered at trial." *Wainwright v. Greenfield*, 474 U.S. 284, 291 (1986) (quotation marks omitted); *see also United States v. Caro*, 637 F.2d 869, 874-75 (2d Cir. 1981) (Friendly, J.) (considerations supporting *Doyle* rule include "that the warnings convey an implicit assurance to a suspect that his silence will not be used against him" (citing *Doyle*, 426 U.S. at 618)).

These concerns are not present, however, where a defendant waives his *Miranda* rights and elects to speak to law enforcement about the offense with which he is charged. As the Supreme Court held in *Anderson v. Charles*,

> *Doyle* does not apply to cross-examination that merely inquires into prior inconsistent statements. Such questioning makes no unfair use of silence because a defendant who voluntarily speaks after receiving *Miranda* warnings has not been induced to remain silent. As to the subject matter of his statements, the defendant has not remained silent at all.

447 U.S. 404, 408 (1980) (per curiam); *see also id.* at 406, 409 (due process not violated where the prosecutor asked defendant on cross-examination, *inter alia*, "[d]on't you think it's rather odd that if [your trial testimony] were the truth that you didn't come forward and tell anybody at the time you were arrested[?]", because "[t]he questions were not designed to draw meaning

from silence, but to elicit an explanation for a prior inconsistent statement"); *People v. Savage*, 50 N.Y.2d 673, 678 (1980) (*Doyle* inapplicable where defendant voluntarily "responded to the opportunity to inform the officer of his involvement in the crime").

*Anderson v. Charles* is squarely on point, as Fox waived his *Miranda* rights and gave an account of his whereabouts and activities the night of Reich's murder that proved inconsistent with his trial testimony. Because Fox thus has no claim to the post-arrest silence contemplated by *Doyle*, I conclude that the state courts' rejection of this claim on the merits was not an unreasonable application of clearly established Supreme Court precedent.[11]

3.      *Ineffective Assistance of Counsel*

Fox asserts two ineffective assistance of counsel claims. In order to establish that his counsel was ineffective, he must prove that (1) counsel's performance fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. *See Strickland v. Washington,* 466 U.S. 668, 687-94 (1984); *see also Harrington v. Richter*, 131 S. Ct. at 792 (in order to satisfy the prejudice prong, "[t]he likelihood of a different result must be substantial, not just conceivable"). The relevant question for a habeas court reviewing a state court's dismissal of an ineffective assistance of counsel claim is "not whether counsel's actions were reasonable," but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 131 S. Ct. at 788.

---

[11]      Although the Appellate Division first rejected this claim on the ground that it was procedurally defaulted – and Respondent urges that this constituted an independent and adequate state ground for its decision – the Appellate Division also went on to deny the claim on the merits. Because I, too, conclude that the claim has no merit, I do not address Respondent's argument that the claim was procedurally defaulted.

a.    *Counsel's Failure To Object to Contested Evidence*

Fox first contends that his attorney was constitutionally ineffective in not objecting to the admission of Sadecki's or Franklin's testimony on the grounds that it was "irrelevant and non-probative but highly prejudicial." Pet. at 20. He further argues that counsel should have at least requested limiting instructions as to the testimony, "even after the prosecutor had emphasized them in summation." *Id.*

Counsel's failure to object to Sadecki's or Franklin's testimony or to request limiting instructions with regard to the testimony did not fall below an objective standard of reasonableness. Counsel no doubt understood the relevance and admissibility of these witnesses' testimony and settled on a strategy to highlight their criminal histories and self-interested motives to testify in order to discredit them before the jury. *See Richter*, 131 S. Ct. at 790 ("There is a 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.'" (quoting *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) (per curiam))). Moreover, the trial court gave a balanced, standard jury charge as to witness credibility and interested witnesses, and counsel likely concluded that requesting limiting instructions specific to Sadecki's and Franklin's testimony would have provided no additional protection and would only have drawn additional attention to those witnesses. Fox therefore has failed to establish deficient performance or prejudice based on his counsel's omissions, and I conclude that the Appellate Division properly and reasonably dismissed this aspect of Fox's ineffective assistance of counsel claim on the merits.

b.  *Counsel's Failure To Object to the Prosecutor's Comments on Fox's Inconsistent Statements*

Fox also claims that his counsel was constitutionally ineffective in failing to challenge "the prosecutor's use of [Fox's] post arrest silence." Pet. at 20. As noted above, Fox did not choose to remain silent after receiving *Miranda* warnings, and the prosecutor therefore was free to use his prior inconsistent statements to impeach him. I presume that defense counsel knew this important distinction and recognized that the prosecutor was justified in asking Fox about each statement he had made to Detective Kenny on September 27, 2004 and whether he recalled those statements. In addition, the prosecutor's comments in summation regarding Fox's failure to mention the African-American assailants in his pre-trial statements were not improper; the prosecutor focused on the inconsistencies between Fox's trial testimony and his prior statements regarding the night of Reich's murder,[12] and did not refer to Fox's post-arrest "silence," which, in any event, would have been a misnomer. In light of the fact that defense counsel objected frequently and persuasively throughout the course of the trial, I have no trouble concluding that his decision not to object to the prosecutor's aforementioned comments was strategic and his representation was effective on the whole. Accordingly, the state courts' rejection of Fox's ineffective assistance of counsel claim on the merits was reasonable.

---

[12]  Fox especially takes issue with the prosecutor's reference to pre-trial statements Fox made to Sadecki, Franklin and Fox's girlfriend, who was not a witness at trial. Pet. at 19. I find that the prosecutor's comments on such statements were not improperly prejudicial, and defense counsel's failure to object to them in particular was not unreasonable.

CONCLUSION

For the foregoing reasons, the petition is denied.  As Fox has failed to make a substantial showing that he was denied a constitutional right, no certificate of appealability shall issue.

So Ordered.

John Gleeson, U.S.D.J.

Date:   March 7, 2011
        Brooklyn, New York